**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

BKX SERVICES INC. and DAVID NAMDAR, individually and on behalf of others similarly situated,

Plaintiffs,

v.

HDR GLOBAL TRADING LIMITED, ABS GLOBAL TRADING LIMITED, 100X HOLDINGS LIMITED, SHINE EFFORT INC LIMITED, HDR GLOBAL SERVICES (BERMUDA) LIMITED, ARTHUR HAYES, SAMUEL REED, BENJAMIN DELO, and GREGORY DWYER,

Defendants.

Civil Action No.: 1:26-cv-06259

**JURY TRIAL DEMANDED**

**CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

I. NEED FOR ACTION ..... 1

II. PARTIES ..... 4

III. JURISDICTION AND VENUE ..... 9

IV. FACTUAL ALLEGATIONS ..... 11

Bitcoin: Digital Asset & Commodity ..... 11

The Origins of BitMEX ..... 11

BitMEX's Presence and Dependence on United States Customers ..... 12

BitMEX's Manipulation of its Exchange for its own Benefit ..... 12

Harm to BKX Services, David Namdar, & Class Members ..... 16

V. STATUTE OF LIMITATIONS AND TOLLING ALLEGATIONS ..... 17

*Brett Messieh, Drew Lee, & Andrew Lufkin v. HDR Global Trading Limited, et al.*, Case No. 1:20-cv-03232-ALC-SDA (S.D.N.Y.) ..... 18

VI. CLASS ALLEGATIONS ..... 19

VII. CAUSES OF ACTION ..... 21

COUNT ONE Replevin ..... 21

COUNT TWO Fraud ..... 22

VIII. EXEMPLARY DAMAGES ..... 26

IX. JURY DEMAND ..... 26

X. REQUEST FOR RELIEF ..... 27

Plaintiffs BKX Services Inc. and David Namdar bring this action individually and on behalf of all others similarly situated seeking specific recovery of bitcoin in specie against Defendants HDR Global Trading Limited, ABS Global Trading Limited, 100X Holdings Limited, Shine Effort Inc Limited, HDR Global Services (Bermuda) Limited, Arthur Hayes, Samuel Reed, Benjamin Delo, and Gregory Dwyer (collectively, "Defendants" or "BitMEX").

## I. NEED FOR ACTION

1. This case involves the theft of bitcoin. Bitcoin, a crypto-asset, is a kind of digital asset designed to work as a medium of exchange, a store of value, or both. Launched in 2009, Bitcoin was the world's first decentralized crypto-asset and is the largest and most popular crypto-asset to date. Unlike "fiat" currencies, bitcoin does not derive value from any government entity. Whereas currency issued by a government can be devalued by the unlimited issuance of government-issued currency, there is a fixed supply of twenty-one million bitcoin, which makes each bitcoin valuable and scarce. Today, one bitcoin ("BTC"), when measured in terms of U.S. dollars, is valued at $ 64,979.70. But, on its own merit, bitcoin stands as valuable and highly coveted personal property.

2. BitMEX, one of the world's largest crypto-asset exchanges, offers futures and swap products tied to the future performance of crypto-assets. BitMEX, also known as the "Bitcoin Mercantile Exchange," describes its most popular product—the XBTUSD Perpetual Swap or Perpetual Contract—as "the most traded cryptocurrency product of all time" with more than two trillion sold.

3. The XBTUSD tracks the price of the exchange rate between the U.S. Dollar and bitcoin. Investor-customers who purchase a position (long) in XBTUSD profit if the price of bitcoin increases at the expense of the U.S. Dollar. On the other hand, a customer selling a position (short) in XBTUSD profits if the price of bitcoin decreases in U.S. Dollars. In other words, the XBTUSD

offers a financial risk and/or reward associated with a future change in the exchange rate between bitcoin and the U.S. Dollar.

4. To trade a XBTUSD contract, an investor-customer must first deposit bitcoin they obtain from another source to use as collateral on the contract. BitMEX lures customers by allowing them to leverage their positions up to 100 times the collateral they posted—nearly twenty times greater than the usual ratio. A trader could buy or sell 100 bitcoin worth of XBTUSD contracts for only one bitcoin of collateral.

5. During the Class Period, BitMEX promised to cap traders' losses at the amount of their collateral through automatic liquidation. Using a computer program known as a liquidation engine, BitMEX automatically closed any position with unrealized losses equal to half of the amount of the investor-customer's posted collateral. At this point, when the collateral was still worth approximately twice the losses incurred on the contract, BitMEX would automatically liquidate it and seize all the investor's remaining collateral.

6. BitMEX set the liquidation point higher than necessary to protect itself against losses, allowing it to routinely profit from these liquidations. BitMEX pocketed the remaining collateral and placed it into its "Insurance Fund." The trader who lost on the contract received nothing—even from the additional amount taken by BitMEX.

7. BitMEX marketed this as a system designed to prevent losses greater than the collateral and to make sure the winning trader received full profits. From May 2018 onward, under the guise of capping losses, BitMEX used this automatic liquidation mechanism to defraud its customers out of their bitcoin by manipulating both its systems and the market.

8. At the heart of BitMEX's fraudulent scheme was its Insider Trading Desk, which had two critical advantages that BitMEX failed to disclose to its customers.

9. **First**, the Insider Trading Desk allowed BitMEX unfettered "God access" to information it misled customers into believing was private. For example, BitMEX misled customers into believing that they could place "hidden orders" that would be concealed from other traders, and that the liquidation points of each of their positions would be kept private. BitMEX leveraged this information to trade against its customers. BitMEX employees operating the Insider Trading Desk—including Defendant Gregory Dwyer—used software to determine which market movements would liquidate the highest number of customers and then made strategic trades to induce those price movements.

10. **Second**, the Insider Trading Desk could trade during server freezes that locked out ordinary customers. When performing the automatic liquidations, BitMEX checked the entire system when the price of a product changed. This process supposedly caused the servers to freeze and lock out its customers. Indeed, BitMEX strategically froze its servers during periods of high volatility so that its Insider Trading Desk could maximize the number of customers to be liquidated. BitMEX routinely did so at crucial times under the guise of technical issues in BitMEX's servers. But while BitMEX's customers were locked out of the exchange, the price of BitMEX's products was not frozen. Customers were unable to enter or withdraw orders, the Insider Trading Desk traded freely.

11. In sum, BitMEX deliberately developed a system that profited from the liquidations (by seizing its customers' bitcoin), while its customers were unable to escape the unfavorable positions BitMEX created. BitMEX's insider trading, market manipulation, and server freezes all served one purpose: seizing customer's bitcoin collateral. This action seeks, first and foremost, to recover in-kind the property BitMEX converted and to hold Defendants accountable for the fraudulent conduct that made that conversion possible.

12. As a result of BitMEX's scheme to defraud its customers and to evade U.S. laws intended to protect BitMEX customers from money laundering and fraud, several civil and criminal

lawsuits were brought against BitMEX and its Founders. In April 2020, a class action lawsuit was filed against BitMEX in the Southern District of New York asserting various claims under the Commodities Exchange Act based on the same conduct alleged herein.

13. Still to this day, however, BitMEX continues to operate the platform without any repercussions. BitMEX's actions cannot and should not go unnoticed or unpunished.

## II. PARTIES

14. Plaintiff BKX Services Inc. ("BKX Services") is incorporated under the laws of Nevada, with its principal place of business in California. BKX Services is registered to do business in New York but is not currently conducting active operations. During the relevant period (2018), BKX Services was headquartered in New York as BKX Services' New York office—located at 200 Liberty Street, 30th Floor, New York City, New York, 10281—was the center of its operations, as well as where executives met to make decisions about the direction of the company, develop budgeting and funding strategies, negotiate with potential investors, and sign contracts, among other things.

15. BKX Services like the other members of the Class, lost bitcoin as a result of BitMEX's fraudulent conduct.

16. During the Class Period, BKX Services purchased bitcoin derivative products on BitMEX's platform, the price of which had been artificially manipulated by BitMEX, and as a result, BKX Services suffered the loss of its property (and other damages) in the amount of at least 305.80903296 BTC. BKX suffered at least the following liquidations on BitMEX:

a. On July 4, 2018, BKX Services was liquidated by BitMEX for its position in XBTUSD and lost 16.73595321 BTC as a result.

b. On July 10, 2018, BKX Services was liquidated by BitMEX for its position in XBTUSD and lost 11.47518129 BTC as a result.

c. On July 15, 2018, BKX Services was liquidated by BitMEX for its position in XBTUSD and lost 4.67970494 BTC as a result.

d. On July 20, 2018, BKX Services was liquidated by BitMEX for its position in XBTUSD and lost 6.49327632 BTC as a result.

e. On July 24, 2018, BKX Services was liquidated by BitMEX for its position in XBTUSD and lost 27.72020431 BTC as a result.

f. On July 26, 2018, BKX Services was liquidated by BitMEX for its position in XBTUSD and lost 7.44881956 BTC as a result.

g. On July 31, 2018, BKX Services was liquidated by BitMEX for its position in XBTUSD and lost 29.14012112 BTC as a result.

h. On August 6, 2018, BKX Services was liquidated by BitMEX for its position in XBTUSD and lost 19.35130819 BTC as a result.

i. On August 11, 2018, BKX Services was liquidated by BitMEX for its position in XBTUSD and lost 81.37056189 BTC as a result.

j. On August 13, 2018, BKX Services was liquidated by BitMEX for its position in XBTUSD and lost 60.34510563 BTC as a result.

k. On August 14, 2018, BKX Services was liquidated by BitMEX for its position in XBTUSD and lost 30.13998302 BTC as a result.

l. On August 17, 2018, BKX Services was liquidated by BitMEX for its position in XBTUSD and lost 6.96721547 BTC as a result.

m. On August 20, 2018, BKX Services was liquidated by BitMEX for its position in XBTUSD and lost 3.94159801 BTC as a result.

17. David Namdar is a resident of San Juan, Puerto Rico. During the Class Period, David Namdar resided in New York. Namdar, like the other members of the Class, lost bitcoin as a result of BitMEX's fraudulent conduct.

18. Using an alias, Namdar purchased bitcoin derivative products on BitMEX's platform, the prices of which had been artificially manipulated by BitMEX, and as a result suffered losses of his bitcoin. For example, Namdar suffered the theft of 316.85578220 BTC through at least the following liquidations on BitMEX:

a. On August 6, 2019, Namdar was liquidated by BitMEX for his position in XBTUSD and lost 19.33287668 BTC as a result.

b. On August 7, 2019, Namdar was liquidated by BitMEX for his position in XBTUSD and lost 10.25764427 BTC as a result.

c. On August 14, 2019, Namdar was liquidated by BitMEX for his position in XBTUSD and lost 55.65539747 BTC as a result.

d. On October 24, 2019, Namdar was liquidated by BitMEX for his position in XBTUSD and lost 128.5801977 BTC as a result.

e. On March 20, 2020, Namdar was liquidated by BitMEX for his position in XBTUSD and lost 5.19058371 BTC as a result.

f. On March 28, 2020, Namdar was liquidated by BitMEX for his position in XBTUSD and lost 4.18099646 BTC as a result.

g. On April 30, 2020, Namdar was liquidated by BitMEX for his position in XBTUSD and lost 12.87608421 BTC as a result.

h. On May 1, 2020, Namdar was liquidated by BitMEX for his position in XBTUSD and lost 6.11373259 BTC as a result.

i. On May 2, 2020, Namdar was liquidated by BitMEX for his position in XBTUSD and lost 3.51810718 BTC as a result.

j. On May 10, 2020, Namdar was liquidated by BitMEX for his position in XBTUSD and lost 8.94761162 BTC as a result.

k. On May 11, 2020, Namdar was liquidated by BitMEX for his position in XBTUSD and lost 3.34586421 BTC as a result.

l. On May 12, 2020, Namdar was liquidated by BitMEX for his position in XBTUSD and lost 19.5759628 BTC as a result.

m. On May 15, 2020, Namdar was liquidated by BitMEX for his position in XBTUSD and lost 7.75357471 BTC as a result.

n. On May 16, 2020, Namdar was liquidated by BitMEX for his position in XBTUSD and lost 6.49381405 BTC as a result.

o. In addition to the above losses, Namdar suffered at least sixty-nine additional losses of less than two BTC each during the Class Period.

19. Defendant HDR Global Trading Limited ("HDR") is incorporated in the Republic of Seychelles, company registry number 148707, with its principal office located at Global Gateway 8, Rue de la Perle, Providence Mahé, Seychelles. HDR owns and operates a trading platform called BitMEX. By 2017, it had become, and remains, one of the largest crypto-asset derivatives exchange in the world, with the highest trading volume of any such derivates exchange. In 2018, HDR operated the platform out of an office in Manhattan. In July 2020, HDR Global Trading Limited was restructured to be a subsidiary of the "100x Group."

20. Defendant ABS Global Trading Limited ("ABS") is a Delaware corporation created in 2017 and wholly owned by HDR. ABS is registered to do business in New York. According to public records, ABS is headquartered at 31 Conduit Road, Flat 17B, The Morgan, Hong Kong. ABS is

responsible for technical aspects of the platform, including security services and implementing the interface traders use to buy and sell products.

21. Defendant 100x Holdings Limited ("100x") is a holding company incorporated in Bermuda in 2020, company registry number 55678. Upon information and belief, 100x is the holding structure for HDR Global Trading, including the BitMEX platform as of 2020.

22. Defendant Shine Effort Inc Limited ("Shine") is a Hong Kong corporation incorporated in 2014, company registry number 2129744, and a subsidiary of HDR and 100x. Shine was and/or is the entity through which BitMEX conducted and/or still conducts trading, both on its own BitMEX platform and with market participants on other exchanges.

23. Defendant HDR Global Services (Bermuda) Limited ("HDR Services") is a Bermudian company incorporated in 2018, company registry number 53775. It employed and/or still employs personnel performing duties for BitMEX.

24. Defendants ABS, HDR, 100x, Shine, and HDR Services share and/or shared common ownership directors and refer to themselves collectively as "BitMEX." They make job postings that do not differentiate between the companies, and employees identify themselves as working for "BitMEX." Each of these entities engage in sufficient marketing and technical work that necessarily touches upon every facet of BitMEX's operations, including its manipulation and liquidations of its user's bitcoin. During the relevant period, BitMEX operated the trading platform in the Southern District of New York and committed the tortious acts alleged herein within New York City.

25. Defendant Arthur Hayes is the founder and former CEO of both HDR and ABS. On information and belief, Hayes is a U.S. citizen, who resides in Singapore, Hong Kong, and Hokkaido, Japan.

26. Defendant Samuel Reed was the Chief Technical Officer of both HDR and ABS and co-founded them along with Hayes and Delo. On information and belief, Reed is a U.S. citizen. He may be served at [redacted] Norwell, Massachusetts [redacted], or wherever else he may be found.

27. Defendant Benjamin Delo co-founded both HDR and ABS with Hayes and Reed. He is a U.K. citizen. On information and belief, he currently resides in the United Kingdom.

28. Hayes, Reed, and Delo together controlled the operations of BitMEX. BitMEX employees who manage certain aspects of the trading facility all ultimately act under the direction and control of Hayes, Delo, and Reed. Key financial and trading decisions required "Founder" approval, meaning approval by Hayes, Delo, and Reed. Hayes, Delo, and Reed continued to control BitMEX until October 8, 2020, when they were removed from their management responsibilities following their federal indictments.

29. Defendant Gregory Dwyer was the head of business development at BitMEX. On information and belief, Dwyer is a citizen of Australia who resides in Bermuda. He may be served at [redacted], or wherever else he may be found.

## III. JURISDICTION AND VENUE

30. This Court has subject matter jurisdiction over the parties and the subject matter of this proceeding pursuant to 28 U.S.C. § 1332(d)(2). In the aggregate, when expressed in U.S. dollars, Plaintiffs' and the Class's claims exceed $5,000,000 exclusive of interest and costs, and there are numerous class members who are citizens of states other than Defendants' states of citizenship. The Court has specific jurisdiction over Defendants because Plaintiffs, individually and in their capacity as Class representatives, deposited their bitcoin on BitMEX's platform in New York and ultimately suffered injuries in New York.

31. This Court has personal jurisdiction over BitMEX under Federal Rule of Civil Procedure 4(h)(1)(A) and New York's long-arm statute, N.Y. C.P.L.R. § 302, because BitMEX transacts business within the state and committed the tortious acts alleged herein within New York.

32. BitMEX's activities occurred in and/or were aimed at the State of New York in connection with BitMEX's manipulation of the bitcoin derivatives sold on the exchange platform. As shown by public records related to criminal proceedings against BitMEX's founders, officers, and/or agents Arthur Hayes, Benjamin Delo, and Samuel Reed, during the relevant period, BitMEX had and/or has extensive operations in Manhattan, New York where senior executives and other employees were based. (**Exhibit 3**, Indictment of Arthur Hayes, et al., dated September 21, 2020, ¶¶ 19, 33.a.) In their plea allocutions, BitMEX's founders admitted to there being U.S.-based use of BitMEX in Manhattan and in the Southern District of New York. (*E.g.*, **Exhibit 4**, Plea Allocution of Arthur Hayes, dated March 2, 2022, at 18:15–19:11.)

33. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2), because a substantial portion of the unlawful acts alleged herein were performed and had effects (including injuries) within the Southern District of New York. Throughout the Class Period, BitMEX maintained an office in Midtown Manhattan and recruited employees for this office. At that time, BitMEX regularly solicited employees for positions in the New York City area, illustrating a clear intent to maintain a presence in, and operate from, New York in marketing itself to investors in this State and this District. Throughout 2018, BitMEX employee, Greg Dwyer, operated BitMEX's Insider Trading Desk out of Manhattan. BitMEX, through the Insider Trading Desk, effectuated the seizure of Plaintiffs' and the other Class members' bitcoin from and in Manhattan.

## IV. FACTUAL ALLEGATIONS

**Bitcoin: Digital Asset & Commodity**

34. Bitcoin refers to both a system and a unit. A unit is called bitcoin. As a system, Bitcoin operates as a decentralized, peer-to-peer network that enables proof and transfer of ownership of units without dependence on third parties. Launched in 2009, Bitcoin has proven to be a valuable and coveted commodity. It was the world's first decentralized crypto-asset and is also the largest and most popular crypto-asset. In 2015, the CFTC formally designated bitcoin a commodity.

35. Bitcoin can be purchased, sold, and/or transferred on online crypto-asset exchanges. Transferring or using a bitcoin requires an address (sometimes called a wallet) and a public and a private encryption key. The address presents as a long string of numbers and letters. Every address is associated with a public key. Every public key derives from a private key. The private keys allow the holders to unlock access to the address to transfer a bitcoin to another address.

36. When transferring bitcoin, the owner of the bitcoin transmits a message—a transaction—on the public Bitcoin network. That transaction, like all bitcoin transactions, is recorded on a public ledger by miners and is propagated across the decentralized Bitcoin network.

**The Origins of BitMEX**

37. BitMEX is one of the largest crypto-asset exchanges worldwide. Between November 2014 and October 7, 2024, BitMEX earned over $1 billion in transaction fees on its platform. BitMEX considers itself the top trading platform.

38. BitMEX does not sell bitcoin. Rather, BitMEX offers futures and swaps products. Futures and swaps products are tied to the future performance of assets.

39. To use BitMEX's platform and purchase BitMEX's futures and swap products, investor-customers must first deposit their own bitcoin into an account with BitMEX. Once deposited, investor-customers use that bitcoin as collateral for BitMEX's futures and swap products.

40. BitMEX self-describes its most popular product—the XBTUSD Perpetual Swap or Perpetual Contract—as "the most traded cryptocurrency product of all time" with more than two trillion sold.

**BitMEX's Presence and Dependence on United States Customers**

41. Despite the illegality to do so without complying with the Commodities Exchange and Bank Secrecy Acts (which BitMEX did not), during the Class Period, BitMEX marketed to and depended upon American customers, including customers in New York. Internal reports within BitMEX identified the United States as the most popular country for BitMEX active traders. BitMEX—by and through all Defendants—allowed U.S. persons to access and trade on its platform to benefit itself through forced liquidations (theft) of their U.S. customers' bitcoin.

42. During the Class Period, BKX Services and Namdar traded from their accounts on BitMEX's platform in domestic U.S. transactions.

**BitMEX's Manipulation of its Exchange for its own Benefit**

43. At the core of BitMEX's fraud sat its Insider Trading Desk. Operation and management of the Insider Trading Desk occurred largely through Greg Dwyer from BitMEX's office in Manhattan, New York. Through the Insider Trading Desk, BitMEX itself traded on its exchange with its own customers. BitMEX created the Insider Trading Desk after pivoting its business model to serving retail investors, primarily focusing on "100X leverage" trades.

44. 100X leverage trades allowed BitMEX customers to leverage at a ratio of 100:1—nearly twenty times greater than the usual ratio. By doing so, BitMEX positioned itself to not only manipulate the market but benefit directly from its manipulation. The higher leverage rates allowed the exchange to liquidate contracts when their values fell at or below certain levels dictated by BitMEX.

45. Liquidation of a contract comes with a steep price to BitMEX's customers. When liquidating contracts, BitMEX seized all of its investor-customer's remaining collateral (their bitcoin) for that contract. BitMEX set an incredibly high liquidation point—higher than necessary to protect itself from the risk of a loss on a contract greater than the investor-customer's collateral. The 100X leverage magnified both gains and losses because, if the price of the XBTUSD increases even by just one percent, the buyer will have lost all his collateral. This is the mechanism by which BitMEX benefitted from the liquidations.

46. BitMEX made these highly leveraged trades more appealing by promising to cap their investor-customers' liability. Using a computer program known as a liquidation engine, BitMEX automatically closed any position with unrealized losses equal to half of the amount the investor-customer's posted collateral. BitMEX justified this tactic to prevent losses greater than the posted collateral and to ensure the winner of the swap receives its full profits. In other words, BitMEX agreed to cover winnings to prevent its winners from being adversely affected by the lack of a counterparty's collateral in exchange for the automatic taking of the loser's collateral.

47. But this liquidation system lured traders into a false sense of security so that BitMEX could take their bitcoin when automatically liquidating its losing customer's positions. BitMEX did not wait to liquidate until the collateral—the losing customer's bitcoin—could no longer cover losses. It liquidated the collateral when the collateral was still worth nearly twice the losses incurred, even though the trader still had half of the initial collateral remaining. And, through this practice, BitMEX effectively retained that recovery for itself.

48. BitMEX placed these profits into its "Insurance Fund"—an account BitMEX used to hold its customers' Bitcoin collateral after liquidating the customer's account. BitMEX marketed its Insurance Fund as an account ensuring cash on hand to cover losses when an investor's losses exceeded her collateral. But the Insurance Fund grew greatly from BitMEX's frequent liquidations.

49. Despite its name, the Insurance Fund never recognized any particular amount of bitcoin for reserve. At any time, BitMEX could, and still can, empty some or all of the Insurance Fund. And the growth of the Insurance Fund is astonishing—from just July 26, 2019, to January 25, 2021, the Insurance Fund grew by .78 bitcoin for every position liquidated in a given day.

50. The Insurance Fund's growth is largely explained by the fact that BitMEX liquidated more positions when more volatility was introduced into the market. In highly volatile markets, more traders will purchase BitMEX's products. There will be more players—potentially more losers. As a result, the BitMEX exchange created a target for manipulation from insider trades.

51. A true "insurance" fund, serving a legitimate insurance function, would generally decline in periods of higher volatility—not increase. But BitMEX's Insurance Fund accomplishes the exact opposite result at the expense of its own customers' collateral because of BitMEX's market manipulation.

52. BitMEX carried out its market manipulation through the Insider Trading Desk. The Insider Trading Desk allowed BitMEX limitless access to customer accounts—information that BitMEX's customers believed and were told was private—while BitMEX traded on its exchange.

53. The Insider Trading Desk used software that allowed BitMEX to determine market movements and which moves it would make that could liquidate the highest number of customers and which trades would induce price movements.

54. BitMEX concealed the Trading Desk as long as possible. On April 30, 2018, BitMEX—against its will—revealed the Insider Trading Desk's existence. But it continued to conceal the reality that BitMEX—through the Insider Trading Desk—was manipulating the market so that it could liquidate its customers' positions at the expense of their bitcoin. BitMEX's deception went so far as to create "burner" trading accounts paired with generic email addresses to appear as any other trading customer on the exchange.

55. Publicly, BitMEX promised its customers that certain trading information would not be visible to other traders, including the liquidation points of each of its customers' positions. In other words, BitMEX's customers did not and do not know when other traders in the market will close their positions out, but BitMEX—through the Insider Trading Desk—did and still does.

56. BitMEX also permitted customers to place hidden orders concealed from other traders. But the Insider Trading Desk enjoyed full access to manipulate the market and force liquidations.

57. If the harsh liquidation policy and insider trading were not enough, BitMEX would repeatedly block their customers from accessing their own accounts—to withdraw their positions and not lose their bitcoin collateral—while it manipulated the market on the exchange through its Insider Trading Desk, which was fully immune and unaffected by the lockouts. BitMEX effectively prevented its customers from escaping the dire positions BitMEX placed them in so that BitMEX could liquidate their positions and ultimately seize the collateral on the swap—the customers' bitcoin.

58. Adding insult to injury, BitMEX strategically froze its servers during periods of high volatility so that its Insider Trading Desk could maximize the number of customers to be liquidated. BitMEX routinely did so at crucial times under the guise of technical issues in BitMEX's servers.

59. BitMEX, when performing the automatic liquidations, checked the entire system when the price of a product changed. This process supposedly caused the servers to freeze and lock out its customers.

60. But, while BitMEX's customers were locked out of BitMEX's exchange, the prices of BitMEX's products were not frozen. Trades and liquidations still occurred even though the investor-customers were locked out. BitMEX was well aware of these issues as multiple investor-customers emailed or otherwise alerted it to the issues. Rather than removing the potential for these market manipulations that only benefit BitMEX, BitMEX deliberately developed a system that profited from

the liquidations (by seizing its customers' bitcoin), while its customers were unable to escape the unfavorable positions BitMEX created.

61. At all times, BitMEX deceived its investor-customers and manipulated its trading and artificial liquation systems to benefit itself through these seizures—i.e., theft of BitMEX's customers' bitcoin.

**Harm to BKX Services, David Namdar, & Class Members**

62. The intersection of BitMEX's casino-like structure, punitive liquidation system, and manipulative freezes are illustrated by the shared experiences of the Class members, who invested in derivatives products offered by BitMEX, motivated by the potential for rapid gains enabled by BitMEX's highly leveraged structure. These customers, including BKX Services and Namdar, fell victim to having their positions liquidated due to BitMEX's market manipulations described above.

63. Both BKX Services' and Namdar's experiences were typical of other Class members who were unable to protect their positions from liquidations during server freezes.

64. On March 13, 2020, customers were locked out from BitMEX's trading platform for about twenty-five minutes, resulting in the liquidation of $800 million of its customers' highly leveraged positions. That same day, BitMEX misrepresented in a tweet that the lockout resulted from a "hardware issue" with the platform's cloud service provider. Then, on March 17, 2020, BitMEX tweeted that the root cause of the March 13 lockout was two distributed denial-of-service attacks.

65. BitMEX never compensated Class members for their losses resulting from liquidations during server freezes. Nor did BitMEX disclose to customers that such server freezes had been and would continue to be deliberate, or that such server freezes would happen and consistently work to its customers' detriment.

66. As a direct result of BitMEX's misrepresentations, omissions, and manipulation of the market for their derivative products, including through the use of the server freezes and a hidden

intentional trading desk used to trade against customers, create profitable liquidations, and manipulate reference exchanges, Plaintiffs and members of the Class have lost thousands of bitcoin and suffered significant actual losses in an amount to be proven at trial.

## V. STATUTE OF LIMITATIONS AND TOLLING ALLEGATIONS

67. Plaintiffs assert all applicable state common law rights and theories related to the tolling or extension of any applicable statute of limitations, including equitable tolling and class action tolling.

68. Neither Plaintiffs nor members of the Class were in a position to appreciate the scope of Defendants' fraudulent and manipulative activities at the time those events occurred.

69. Prior to April 30, 2018, Defendants concealed the existence of the Insider Trading Desk that transacted against the interests of their own customers. Before this revelation, Plaintiffs and members of the Class could not reasonably have known that BitMEX was trading against its own customers. Even when this information was revealed, however, BitMEX continued to prevent Plaintiffs and members of the Class from recognizing the existence of the manipulation because it falsely claimed that this desk was only engaging in a market-making function. Key aspects of BitMEX's scheme—including BitMEX insiders' ability to trade during freezes, the creation of secret Gmail accounts for use by BitMEX insiders to trade against customers using inside information, and the manipulation of BitMEX's reference exchanges to force liquidation of customer accounts—have become apparent only because of factual and expert research that could not have been reasonably undertaken by any class member acting alone. Information about the creation and operation of the Insider Trading Desk was concealed, preventing members of the Class from recognizing their injury.

70. Plaintiffs' claims are tolled by the applicable statutes of limitations' tolling provisions, as held by the U.S. Supreme Court in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974),

and/or the New York Court of Appeals in *Bermudez Chavez v. Occidental Chem. Corp.*, 158 N.E.3d 93 (N.Y. 2020), and their progeny.

71. The accrual and running of any applicable statutes of limitations has been tolled from April 23, 2020, until June 30, 2025, pursuant to *American Pipe*, *Bermudez Chavez*, and/or their progeny.

***Brett Messieh, Drew Lee, & Andrew Lufkin v. HDR Global Trading Limited, et al.*, Case No. 1:20-cv-03232-ALC-SDA (S.D.N.Y.)**

72. On April 23, 2020, Brett Messieh, Drew Lee, and Andrew Lufkin timely filed a putative class action complaint in the U.S. District Court for the Southern District of New York against Defendants based on the same facts and conduct alleged herein.

73. On October 7, 2024, those plaintiffs filed their Third Amended Class Action Complaint and alleged the following causes of action under the Commodity Exchange Act: (1) Deceptive Device and Fraudulent Course of Business; (2) Manipulative Device and Contrivance; (3) Price Manipulation; (4) Principal-Agent Liability; and (5) Aiding and Abetting. (**Exhibit 1**, Third Amended Class Complaint, dated October 7, 2024, ¶¶ 198–279.) Those claims are substantially similar to and/or encompass the claims brought herein.

74. The *Messieh* proposed class was defined similarly to the Class in this suit:

> All persons who purchased any Bitcoin or Ethereum swap products on BitMEX in domestic U.S. transactions between February 28, 2016 and an end date to be determined by the Court and were injured thereby. (*Id.* ¶ 185.)

75. Plaintiffs and members of the Class fall within that class definition as Plaintiffs and the putative class members purchased Bitcoin swap products on BitMEX's trading platform in domestic U.S. transactions from July 23, 2018 onward.

76. The named parties in the *Messieh* action stipulated to the voluntary dismissal of all claims in the Third Amended Complaint and, on June 30, 2025, the *Messieh* court entered an order of voluntary dismissal under Federal Rule of Civil Procedure 41(a)(2) and dismissed the *Messieh* suit without prejudice. (**Exhibit 2**, Stipulation and Order of Voluntary Dismissal, dated June 30, 2025.)

## VI. CLASS ALLEGATIONS

77. Plaintiffs bring this action as a class action under Federal Rule of Civil Procedure 23 and seek certification of the following Class: All persons who purchased any Bitcoin swap products on BitMEX in domestic U.S. transactions between July 23, 2018 and an end date to be determined by this Court and were injured thereby.

78. The Class Period is July 23, 2018 through the end date as determined by the Court.

79. Plaintiffs reserve the right to extend the Class Period should they learn, through discovery, that the conduct described above extended back further in time and harmed additional individuals not captured in the current Class Period.

80. Excluded from the Class are (a) Defendants, their officers and directors, and members of their immediate families or their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest, (b) any judge or other judicial officer assigned to or presiding over this action, any member of such judicial officer's immediate family (including spouse or domestic partner, parents, siblings, and children), any person related by blood or marriage to such judicial officer within the third degree of consanguinity, and any officer, director, or employee of this Court or of any appellate court to which this action may be appealed, and (c) counsel of record for all parties and their respective law firm partners, associates, and immediate family members.

81. Plaintiffs reserve the right to amend the Class definition if investigation or discovery indicate that the definition should be narrowed, expanded, or otherwise modified.

82. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are tens of thousands of members in the proposed Class.

83. Members of the Class are readily ascertainable and identifiable. Members of the Class may be identified by publicly accessible blockchain ledger information and records maintained by Defendants or their agents. They may be notified of the pendency of this action by electronic mail using a form of notice customarily used in complex litigation.

84. Plaintiffs' claims are typical of the claims of the Class members, as all members are similarly affected by Defendants' respective wrongful conduct in violation of the laws complained of herein. Plaintiffs do not have any interest that conflicts with the interests of the members of the Class.

85. Plaintiffs and members of the Class sustained losses from Defendants' common course of unlawful conduct.

86. Plaintiffs have fairly and adequately protected, and will continue to fairly and adequately protect, the interests of the members of the Class and have retained counsel competent and experienced in class actions, complex litigation, and the types of claims asserted herein.

87. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class, including:

a. Whether BitMEX profited through its Insider Trading Desk at the expense of its customers;

b. Whether BitMEX intentionally triggered liquidations of its customers—thefts, including through its Insider Trading Desk;

c. Whether BitMEX caused server freezes and customer lockouts in order to enable its market manipulation and profit at its customers' expense;

d. Whether BitMEX made material omissions regarding the frequency and effect of its server freezes and customer lockouts;

e. Whether BitMEX failed to disclose to its customers the existence and scope of operations of its Insider Trading Desk and otherwise employed a deceptive device and fraudulent course of business;

f. Whether BitMEX created secret anonymized accounts that it used to trade against its customers using its full visibility into their profiles;

g. Whether BitMEX controlled accounts that were secretly able to trade while regular customers were locked out of the platform;

h. Whether BitMEX actively manipulated prices on the reference exchanges, and on BitMEX, in order to profit and to liquidate its own customers;

i. Whether BitMEX's customers were harmed by BitMEX's fraudulent conduct; and

j. Whether BitMEX unlawfully retained possession of its customers' bitcoin.

88. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the losses suffered by some individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.

89. There will be no difficulty in the management of this action as a class action.

## VII. CAUSES OF ACTION

### COUNT ONE
### Replevin

90. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs.

91. Plaintiffs and members of the Class submitted their own bitcoin as collateral to purchase BitMEX's products. At all times, the bitcoin remained and still is property of the Plaintiffs and members of the Class.

92. BitMEX unlawfully retained possession of Plaintiffs' and the Class members' bitcoin, despite Plaintiffs' and the Class members' superior right of possession. BitMEX, by manipulating the market through its Insider Trading Desk, forced liquidations at the expense of its customers including Plaintiffs and members of the Class. These liquidations resulted in the seizure—theft—of bitcoin that rightfully belongs to Plaintiffs and members of the Class.

93. BitMEX has unlawfully withheld the bitcoin from Plaintiffs and the Class members since the unlawful seizures. Upon information and belief, Plaintiffs' wrongfully withheld bitcoin are in the possession of the BitMEX entities and/or their founders.

94. Based on this conduct, Plaintiffs and members of the Class are entitled to an order directing the bitcoin to be returned by BitMEX forthwith.

**COUNT TWO**
**Fraud**

95. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs.

96. BitMEX committed fraudulent omissions regarding the nature and operations of the Insider Trading Desk. In particular, BitMEX failed to disclose and/or omitted that BitMEX was:

a. Operating the Insider Trading Desk, which enjoyed information and technical advantages over BitMEX customers, to trade against its customers;

b. Artificially manipulating the price of bitcoin on U.S.-based third-party reference exchanges to make its own trades profitable and to force customer liquidations;

c. Using secret, anonymous accounts to trade against BitMEX customers;

d. Granting privileged access to the BitMEX platform to the anonymized accounts, including while customers were locked out;

e. Triggering automatic liquidations of trading positions through customer lockouts and the manipulation of prices on reference exchanges and on the BitMEX platform; and

f. Viewing "Hidden Orders," along with its insiders, despite stating on its website that these "Hidden Orders" were "not visible on the public orderbook" and that "Traders use this order type when they don't want to inform the market of their trading intentions."

97. The unique and hidden functionality afforded to the Insider Trading Desk meant that customers promised a fair playing field were in fact being manipulated by BitMEX. BitMEX used these powers to manipulate the prices of its Bitcoin derivatives.

98. Where the use of BitMEX's Insider Trading Desk was a central aspect of BitMEX's operations and significantly affected whether and how a reasonable investor could make net gains from his or her trading on BitMEX, in order to make BitMEX's description of its services on its website not misleading, BitMEX was obligated to disclose that it used a trading desk against its customers.

99. In order to make its description of the activity of the Insider Trading Desk not misleading, BitMEX was obligated to—but did not—disclose the information and technical advantages that it enjoys over BitMEX customers and that the Insider Trading Desk artificially manipulates the prices of bitcoin on the U.S.-based third-party reference exchanges, in order to make its own trades profitable and to force customer liquidations.

100. In order to make its description of the nature and scope of lockouts not misleading, BitMEX was obligated to disclose that the lockouts did not restrict the Insider Trading Desk.

101. To make its description of a "hidden order" not misleading, BitMEX was obligated to disclose that hidden orders were not hidden from BitMEX, and its insiders were obligated to, throughout the Class Period, disclose that BitMEX trades against its customers with knowledge of the details of the hidden orders.

102. Given that BitMEX traded against its own customers, a reasonable BitMEX customer would want to know facts bearing on how BitMEX is likely to be successful in conducting such trades.

103. Despite this, BitMEX knew of and intentionally perpetuated these omissions of material fact.

104. The above omissions of material fact were not known to Plaintiffs and the other members of the Class and could not have been discovered by Plaintiffs or the Class members through the use of ordinary intelligence. A reasonable customer would conclude that no one using the BitMEX platform would be able to trade based on the details of a so-called "hidden" order, and the access to these so-called "hidden" orders provided BitMEX and its insiders with a substantial advantage in trading against BitMEX customers.

105. BitMEX failed to disclose the above material facts because BitMEX believed that Plaintiffs and the Class members would not trade on the platform if they had knowledge of the undisclosed facts.

106. The increasing size of the Insurance Fund induced current and potential BitMEX customers to use the platform and thereby generate further fees for BitMEX, winning trades for BitMEX, and liquidations of trading positions, in a repeating cycle of ill-gotten gains for BitMEX and harm to Plaintiffs and the Class.

107. BitMEX intended that Plaintiffs and the Class rely on these omissions and half-truths throughout the Class Period, and Plaintiffs justifiably and reasonably did so, given that these omissions and half-truths concerned core aspects of BitMEX's business.

108. At the time of BitMEX's forgoing acts, which were intended to mislead and defraud, Plaintiffs and the other members of the Class did not know of Defendants' undisclosed intentions and goals, and in the exercise of reasonable diligence could not have discovered BitMEX's undisclosed intentions and goals.

109. Plaintiffs' and the Class members' reliance on the market conditions they perceived when trading on BitMEX's platform was justified in that they reasonably concluded that they were trading only against other BitMEX customers, and that the prices of Bitcoin derivative products on BitMEX reflected market conditions because they relied on U.S.-based third-party reference exchanges, unaffiliated with BitMEX. Plaintiffs and members of the Class could not have known they were in fact trading in a market containing BitMEX employees who benefitted from undisclosed advantages and subject to price manipulation.

110. With these false impressions established, BitMEX was able to improperly attract customers to use the BitMEX platform, to liquidate customers' trading positions, to use the Insider Trading Desk to orchestrate disadvantageous trades for BitMEX customers, and to manipulate the price of bitcoin on referenced exchanges to orchestrate further disadvantageous trades and position liquidations for BitMEX customers.

111. Plaintiffs and the Class would not have traded on the BitMEX platform and therefore paid the fees and suffered their net losses from such trading, if they had known the actual facts.

112. BitMEX's fraud directly and proximately caused the injury to Plaintiffs and the Class during the Class Period in that Plaintiffs and the Class traded in swaps and/or futures on margin on the platform and paid fees and suffered losses from such trading, as a result of their reasonable failure to know the actual facts.

113. BitMEX's fraud directly and proximately caused further injury to Plaintiffs and the Class during the Class period. Plaintiffs and the Class traded in swaps and/or futures on margin as

they did based on their misunderstanding of the value of bitcoin as reflected on the U.S.-based third-party reference exchanges and suffered net losses as a result of their trading and their reasonable failure to know the actual facts.

114. A foreseeable and natural consequence of the purposes and goals of BitMEX's engagement in a fraudulent course of business was that Plaintiffs and the Class would pay the fees they paid and suffer the net losses they suffered, and that BitMEX would generate the ill-gotten gains they did.

## VIII. EXEMPLARY DAMAGES

115. Plaintiffs and the Class are entitled to receive, and do seek, punitive damages.

116. Upon proof that BitMEX's acts and omissions discussed herein were done (and/or continue to be done) knowingly, willfully, intentionally, with actual awareness, and/or with gross negligence, Plaintiffs seek to recover exemplary damages for themselves and the other members of the Class as permitted by law. More specifically, BitMEX acted with malice towards Plaintiffs as demonstrated by its willful action in reckless and wanton disregard of the rights of Plaintiffs and the other Class members—specifically knowingly defrauding Plaintiffs and members of the Class. At a minimum, BitMEX's conduct amounts to a reckless disregard of Plaintiffs' and the Class members' rights because (a) BitMEX knew of and intentionally perpetuated the omissions described herein, despite their duty to disclose the information and (b) BitMEX kept bitcoin that belonged to Plaintiffs and members of the Class. Absent this litigation, Plaintiffs and the Class would be deprived of thousands of bitcoin, warranting the award of exemplary damages.

## IX. JURY DEMAND

117. Plaintiffs demand a jury trial under Federal Rule of Civil Procedure 38(b) on all triable issues.

## X. REQUEST FOR RELIEF

Plaintiffs, on behalf of themselves and the Class, respectfully request judgment against Defendants as follows:

A. For an Order determining that this action may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, appointing Plaintiffs as Class Representatives and Plaintiffs' counsel of record as Class Counsel, and directing that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class once certified;

B. That Defendants be directed to return Plaintiffs' and each Class members' bitcoin in-kind;

C. That Plaintiffs and each Class member be awarded actual, compensatory, punitive, and all other damages to the maximum extent allowed under applicable law;

D. That Plaintiffs and the other members of the Class recover their costs of suit and reasonable attorneys' fees to the maximum extent allowed by law;

E. That Plaintiffs and the other members of the Class be awarded pre- and post-judgment interest in the maximum amount and to the maximum extent permitted by law; and

F. That Plaintiffs and other members of the Class be awarded any other relief as the case may require and the Court may deem just and proper.

Dated: July 23, 2026

Respectfully submitted,

*/s/ Warren T. Burns*

Warren T. Burns (Attorney Bar Code WB1066)
Daniel H. Charest (*pro hac vice* forthcoming)
Ryan Gaddis (*pro hac vice* forthcoming)
Adrienne Allen (*pro hac vice* forthcoming)
Ariana Noshari (*pro hac vice* forthcoming)
BURNS CHAREST LLP
901 Main Street, Suite 5800
Dallas, Texas 75202
Tel: (469) 904-4550
wburns@burnscharest.com
dcharest@burnscharest.com
rgaddis@burnscharest.com
aallen@burnscharest.com
anoshari@burnscharest.com

Tyler Yagman (New York Bar No.: 5962261)
Yagman Law PLLC
1100 Brickell Avenue, Suite 501S
Miami, Florida 33130
Tyler@yagmanlaw.com

**COUNSEL FOR BKX SERVICES INC., DAVID NAMDAR, AND THE CLASS**